UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                              DECISION AND ORDER
v.                              04-CR-156A

BHAVESH KAMDAR,

                Defendant.

## **INTRODUCTION**

Defendant Bhavesh Kamdar is charged in a multi-count indictment with 20 counts of mail fraud and 10 counts of money laundering. The mail fraud charges related to statements that the defendant had made in the context of negotiating a construction contract with New York State Office of General Services ("OGS") for the performance of construction and remediation work at various state-owned facilities in Western New York. During the contract negotiation process, the defendant made certain statements to OGS relating to the cost to his company, Industrial Site Services ("ISS"), to obtain a labor and performance bond. The defendant successfully persuaded OGS to pay a "guarantee fee" to reimburse ISS for the cost of the performance bond. The indictment charged that the defendant's representations concerning that guarantee fee were false and were made with the specific intent to defraud OGS into paying the fee, and that each mailing made by the defendant

requesting payment of the guarantee fee was a separate act of mail fraud in violation of 18 U.S.C. § 1341. The indictment further charged that each time the defendant deposited a check issued for payment of the guarantee fee, he engaged in a monetary transaction involving the proceeds of criminally derived property in violation of 18 U.S.C. § 1957.

Trial commenced on September 23, 2009 and lasted about four weeks. At the close of the government's case, the defendant moved for judgment of acquittal under Fed. R. Crim. P. 29. The Court reserved decision and permitted the case to go to the jury. Unfortunately, the jury was unable to reach a unanimous verdict and on October 22, 2009, this Court granted a mistrial, thereby necessitating a ruling on the motion. The Court scheduled further briefing and held oral argument on January 20, 2010. For the reasons stated, the defendant's motion for judgment of acquittal is granted as to all of the counts in the indictment.

## **BACKGROUND**

Before getting into the government's evidence at trial, it is necessary to outline the background of the alleged scheme to defraud. The defendant is a civil engineer and the principal and owner of ISS. ISS was the low bidder on a contract to perform removal and environmental remediation of underground petroleum storage tanks located on several New York State properties. ISS's bid included a $500,000 lump sum fee identified as a "guarantee fee" to cover the cost of securing a necessary performance, labor and material bond that would protect the State against loss in the event that ISS defaulted on the contract. OGS objected to the fee as excessive, and

2

negotiations on that issue ensued. When OGS representatives asked the defendant to explain the basis of the "guarantee fee," the defendant told OGS that it was the actual cost to ISS to obtain the performance bond. OGS asked the defendant to document this expense, and the defendant responded by providing OGS with a copy of an invoice in the amount of $52,034.00, from AIG Insurance Company ("AIG"), the bond surety and an invoice from World Wide Agent Services, Inc. in the amount of $7,673.00, which together comprised the bond premium. As to the remainder of the fee, the defendant explained that AIG would not issue the performance bond unless he and his wife provide a personal guaranty and collateral to secure ISS's obligations under the bond in the event of a default. The defendant explained that he and his wife had agreed to do so, but only if ISS would compensate them for the risk to their personal assets. The defendant provided OGS with corporate minutes from an ISS Board of Directors meeting that occurred on December 10, 1997, wherein ISS resolved to pay the defendant and his wife a fee of $87.50 per $1,000 of the contract price as compensation for their agreement "to provide the required individual guarantees, and pledge their personal collateral." Thus, the "guarantee cost" comprised of the premium paid to AIG and World Wide Agent Services, plus the fee that the Kamdars were charging ISS to provide their personal guarantees and pledge their collateral.

Eventually, OGS agreed to award ISS the contract and to pay the "guarantee fee." However, rather than pay the requested flat fee of $500,000, OGS agreed to pay ISS $87.50 per every $1,000 of the contract price by adding a supplement of 9.52% to each of ISS's bills. Based on the original agreed-upon contract price, it was anticipated that the total guarantee fee would be $402,000, and that the total contract price (with

3

the fee added) would be $4,626,630.

After ISS began work on the contract, additional removal and remediation work was performed by ISS and the total contract increased to $12.9 million. Since the guarantee fee was based upon a percentage of the total contract, ISS continued to charge OGS for the guarantee fee in excess of the $402,000 stated in the original contract. ISS ultimately received $1,114,626 in guarantee costs - well over the $402,000 originally anticipated. When the State realized that it had, in its view, overpaid ISS for the guarantee fee, it requested a refund. ISS refused and claimed entitlement to the entire amount. The New York State Attorney General then commenced a civil proceeding against ISS and the defendant alleging breach of contract, fraud and unjust enrichment. Although a state court judge ruled in favor of New York State, that decision was reversed on appeal to the New York State Supreme Court, Appellate Division, Third Department, which ruled that: (1) there was insufficient evidence to prove that the parties intended to place a $402,000 "cap" on the guarantee fee and therefore the State could not prove its breach of contract claim; (2) the State failed to prove its fraud claim because it failed to show that OGS employees reasonably relied on Kamdar's claim to have "pledged" personal collateral; and (3) because OGS failed to prove breach of contract, the State's remaining claims for unjust enrichment and misappropriation of public property could not be sustained. See State of New York v. Industrial Site Services, 52 A.D.3d 1153 (3rd Dep't 2008).

In the interim, the United States Attorney's Office for the Western District of New York commenced a criminal investigation that culminated in the pending indictment charging the defendant with 20 counts of mail fraud and 10 counts of money

laundering. With regard to the mail fraud counts, the indictment charges:

> As a part of its effort to justify the $500,000 for its claimed performance bond expense, the defendant, both personally and through others, made false and fraudulent representations to [OGS] and submitted letters and other writings to [OGS] that contained false and fraudulent statements. Primary among these oral and written false and fraudulent statements were statements that AIG, the company that provided the performance bond, required the defendant and his spouse, Panna Kamdar, *to provide their personal guarantee and collateral, consisting of personal funds of approximately $1 million to AIG before AIG would issue the performance bond.*
>
> *In truth and in fact,* as the defendant well knew, *AIG never asked the defendant or his spouse to provide personal guarantees or collateral* before it would issue the performance bond for [ISS].
>
> In truth and in fact, AIG agreed to provide and thereafter provided the necessary performance bond upon payment of a bond premium of $59,707.

(See Indictment, at ¶ ¶ 6-8)(emphasis added).

It was the government's theory at trial that the defendant intentionally misrepresented the nature of his obligations to AIG when he claimed that AIG required him to provide a personal guaranty and to pledge collateral. Although the defendant and his wife were required to provide a personal guaranty (sometimes referred to at trial as an "indemnity agreement"), they were never required to pledge collateral, and therefore the defendant's statements to that effect were materially false and fraudulent representations intended to induce OGS to pay the guarantee fee.[1] The money laundering counts assert that each time the defendant deposited an OGS-issued check

---

[1] The original indictment also alleged the defendant's request for payments above the $402,000 cap as part of the fraud. However, those allegations were abandoned following the Third Department's ruling.

5

for payment of the guarantee fee, he engaged in a monetary transaction involving the proceeds of criminally derived property.

In his Rule 29 motion, the defendant argues that the mail fraud counts must be dismissed because there was insufficient evidence as to the falsity and materiality of the scheme to defraud. The government opposes the motion asserting that evidence of the defendant's guilt was "overwhelming."

## DISCUSSION

I. **Rule 29 Standard**

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'" United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (quoting United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994)).

As was done in this case, Rule 29(b) expressly permits a court to reserve decision on a motion for judgment of acquittal, proceed with trial, submit the case to the jury and then decide the motion after the jury either returns with a verdict or fails to return a verdict (as happened here). A court may grant a Rule 29 motion only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, the Court finds that no rational trier of fact could have concluded that the Government met its burden of proof. Glenn, 312 F.3d at 63. "'[T]he

6

relevant question is whether ... any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In assessing the merits of the motions, this Court must consider the government's evidence in its totality. Id.

If the evidence construed in the light most favorable to the government would satisfy any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then the motion for judgment of acquittal must be denied. The relevant inquiry is "whether upon the evidence . . . a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). However, where a fact to be proved is also an element of the offense, "it is not enough that the inferences in the government's favor are permissible." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir.), cert. denied, 516 U.S. 1001 (1995). A court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." Id. "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.' " Glenn, 312 F.3d at 70 (quoting United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996)).

## II. Mail Fraud Counts

With regard to the mail fraud counts, Counts 1 through 20 of the indictment, the government was required to prove beyond a reasonable doubt: (1) use of the mails to

further (2) a scheme to defraud by materially false and fraudulent pretenses, representations or promises (3) with money or property as the object of the scheme. United States v. Kinney, 211 F.3d 13, 17 (2d Cir. 2000).

**A.     Scheme to Defraud by False and Fraudulent Representations**

The government failed to prove beyond a reasonable doubt that the defendant engaged in a scheme to defraud involving false and fraudulent representations. In sum and substance, the government claims that the defendant engaged in a scheme to obtain the guarantee fee by false and fraudulent pretenses, representations and promises, namely by lying to OGS regarding the cost to him for obtaining the performance bond. Specifically, the government claims that the defendant falsely told OGS representatives that to obtain the AIG bond, he and his wife were required to provide a personal guaranty and to pledge collateral when, in reality, they were never required to pledge collateral.

The legal definition of "collateral" is "property that is pledged as security for a debt" or "property that is subject to a security interest." See Black's Law Dictionary 278 (8th ed. 1999). A "security interest" is a "property interest created by agreement." Id. at 1387.

The guaranty in this case was a form of security in favor of AIG because it gave AIG a security interest in the defendant's assets and the assets of his company, ISS. A guaranty is a form of security for a debt. Id. at 723 (defining "guarantee" as "something given or existing as security" and defining a "guarantor" as "one who gives security for a debt"); see also, e.g., Nissho Iwai Europe PLC v. Korea First Bank, 99 N.Y.2d 115, 118

(2002) (discussing a personal guaranty and an irrevocable standby letter of credit as *two* forms of security for a particular loan). It protects the surety against a risk of loss in the event of default under the debt. Absent the guaranty, AIG's recourse in the event of a default would be limited to the assets of the corporation, ISS. By giving a personal guaranty, the defendant and his wife were putting *all* of their personal assets at risk, as the particular guaranty in this case was full and unconditional. Thus, the guaranty itself could be viewed as a form of collateral to the surety. (Testimony of Gregory Photiadis, Dkt. 111, at 84, testifying that "[i]ndemnity agreements themselves are considered collateral by bonding companies"); (Testimony of Robert Faust, Dkt. No. 109, at 18-19, testifying that the indemnity agreement "implicitly" provided for collateral because it gave AIG the right to demand the Kamdars' assets as collateral in the event of default). That being the case, the defendant's statement that he was required to "provide a guaranty and to pledge collateral" was in a sense true. In the event of a default, AIG would have the right to demand all of the Kamdars personal assets in satisfaction of the debt. It is also worth noting that the agreement referenced various assets that were expressly identified as "collateral" under the guaranty, and the defendant agreed to "assign, transfer and set over" all of his interest in that collateral. Finally, the guaranty also states that it shall also constitute a "security agreement" under the Uniform Commercial Code. If there was no collateral being pledged under the agreement, there would be no reason for that provision, as a security agreement provides a security interest in collateral.

The government claims that the defendant misled OGS into believing that there was some other personal property pledged - beyond what was stated in the guaranty -

as security for ISS's obligations under the bond. Although this is the government's theory, the evidence presented at trial does not support this. All of the evidence indicated that, when asked to identify what collateral he was referring to, the defendant repeatedly referenced his personal guaranty. For example, when the defendant was asked to justify the cost of the "guarantee fee" included in his bid, the defendant told OGS that the fee represented the cost to ISS for obtaining the bond. When asked to document that statement, the defendant faxed to OGS a memo stating: "[A]ttached are the bond cost invoices as discussed with Mr. O'Connor on the phone." (Gov't Exh. 19, at 1). As attachments, the defendant included invoices for the bond premiums paid to AIG and World Wide Agent Services, and an invoice from the defendant and his wife to ISS in the amount of $434,765.45. The defendant also provided a copy of the minutes of the December 10, 1997 Board of Directors meeting for ISS, wherein ISS resolved to pay the defendant and his wife $87.50 per $1,000 in return for their agreement to provide personal guarantees to ISS. The relevant language of those minutes states:

> The Chairman [defendant] reported that AIG required that the stockholders contribute additional capital to [ISS] and that [ISS] arrange for guarantees of the proposed payment and performance bonds from another party who had a minimum net worth of $1,000,000. *AIG further required that the guarantor pledge its collateral as security for the guaranty* as a condition of issuing the requested payment and performance bonds of [ISS].
>
> The Chairman further reported that the cost to [ISS] for procuring the required guarantees from independent third parties would exceed 10% of the bond amount per annum, based upon the guarantee fees that a venture capital firm and another independent businessman would charge [ISS] for providing the required guarantees. The Chairman further reported that based upon the high cost of obtaining the required guarantees from independent third parties, he discussed with his wife,

> Mrs. Panna Kamdar *providing their personal guarantees to AIG and pledging her personal assets to secure said guaranty in exchange for a guarantee fee of $87.50 per $1000 per bond amount*. The Chairman reported that he and his wife were *willing to personally guarantee to AIG bonds and to pledge their personal collateral to secure their guaranty* for that price which was substantially below the cost to [ISS] of obtaining the required guarantees from independent third parties.

(Id.) (emphasis added). The minutes go on to state that ISS agreed to pay the defendant and his wife the specified fee in exchange for their agreement to "provide the required individual guarantees, and pledge their personal collateral. . . ." (Id.)

OGS responded stating that, before agreeing to pay the "guarantee fee," it needed certification from AIG as to: (1) the names and addresses of the guarantors; and (2) a description and value of the pledged collateral. (Gov't Exh. 22). The defendant responded by faxing Robert Kainz at OGS a copy of the guaranty that he and his wife had signed, along with a cover letter stating: "As you can see the attached agreement is so broad that AIG will not limit themselves by giving a letter stating the amount of collateral. [It's] based upon my Financial Statement. They put this together with all my assets as collateral and any future assets that I acquire." (Gov't Exh. 43). The defendant also attached a letter from AIG to the defendant stating that:

> This letter will outline the terms of our willingness to provide [ISS] with surety credit. We have required the full corporate indemnity of Industrial Site Services as well as the full Personal indemnity of yourselves and your spouses.[2] These indemnities are full and unconditional.

(Id.).

Upon receiving those documents, it should have been clear to OGS that when

---

[2] In addition to the Kamdars' guarantees, AIG was also requiring personal guarantees from Mr. and Mrs. Cary because Mr. Cary was a minority shareholder in ISS.

11

Kamdar referenced his "pledge of personal collateral" he was simply referring to his obligations under the personal guaranty. There was nothing in those documents to suggest that Kamdar was required to provide anything beyond the personal guaranty, and indeed the AIG letter makes that clear.

It appears that OGS misunderstood the defendant's reference to his pledge of collateral to mean that he had *physically delivered* some additional property to AIG, beyond what was promised in the guaranty. OGS witnesses also seem to believe that, in order to constitute collateral, the property pledged would need to be "set aside" so that the pledgor would lose his access to that collateral while the loan was outstanding. In other words, they perceived the defendant's statements concerning his pledge of personal collateral in excess of $1,000,000 to mean that the defendant had actually given AIG over $1,000,000 to be held in some escrow account. While physical delivery of property to a creditor is one way to create a security interest (as in the "rental security" example that the government used during trial), that is not the only way, and in commercial transactions it is seldom used. (Testimony of Gregory Photiadis, Dkt. 111, at 85-86, explaining that it is not legally necessary to have physical possession of cash to have a security interest in it, and that in his 20 years of experience as a commercial lawyer, bonding companies "very seldom actually take[] physical possession of whatever the collateral is."); see also 3 Uniform Commercial Code Transaction Guide, § 27:19 (2009) ( "Although possession of the debtor's collateral is the simplest way for a secured party to perfect and to enforce his security interest in collateral against the debtor or third parties, in a modern commercial setting a debtor rarely can afford to deliver tangible collateral to the secured party or to a third person.") In any event, not

12

one OGS witness testified that the defendant claimed to have placed over $1,000,000 cash in some separate account to be held in escrow by AIG, nor did he claim to have "segregated," "delivered" or "set aside" a specific piece of personal property.[3] The defendant only claimed to have "pledged" his assets as collateral, and to "pledge" means "to promise something as security for a debt." See Black's Law Dictionary 1192 (8th ed. 1999). That is exactly what the defendant did.

Even if it is assumed that the government is correct and that the guaranty is not a "pledge of collateral" in the legal sense, there was considerable evidence indicating that defendant honestly understood his guaranty as a pledge of personal collateral. First, there was the language of the guaranty itself which, as noted, suggests that a pledge of collateral is being made. Second, there was the defendant's own testimony (taken during his civil deposition and introduced into evidence at the criminal trial) stating he did not understand there to be a distinction between a guaranty agreement and the concept of putting up collateral (Testimony of Kamdar, Dkt. No. 108, at 19; 40-41); and that when he told OGS that he and his wife had to pledge more than

---

[3] At most, the defendant made some statements to the effect that, by pledging his assets, he would "lose the use" of them. Reliance on defendant's statement that he would "lose the use" of his assets as a basis for finding fraud is problematic for several reasons. First, that is not the false statement charged in the indictment. The indictment charges that the false statement relates to the defendant's claim to have "pledged collateral." Second, there was no evidence tying that "loss of use" statement to OGS's decision to pay the guaranty fee. Robert Kainz is the person who recommended approving payment of the guaranty fee, and he testified that his decision was based upon the defendant's claim to have pledged collateral. Third, while perhaps not literally true, the defendant was implicitly agreeing that he would not deplete those assets so as to make the guaranty worthless. Faust testified that, as with every guarantee, the defendant and his wife were required to provide AIG with a detailed financial statement specifying all of their existing assets and liabilities, and that implicit in this arrangement was a "handshake deal" between defendant Kamdar and AIG prohibiting the depletion of those assets.

$1,000,000 of their personal collateral to secure the guaranty, he was referring to the pledge made in the personal guaranty (Id. at 42-46, 52, 56). Third, there was the fact that when OGS pressed the defendant to specify exactly what collateral he was referring to, the defendant pointed only to the guaranty agreement and explained that "AIG [would] not limit themselves by giving a letter stating the amount of collateral. [It's] based upon my Financial Statement. [AIG] put this [guaranty agreement] together with all my assets as collateral and any future assets that I acquire." (Gov't Exh. 43).[4] Finally, there was testimony from the government's own witnesses stating that it is commonplace for contractors to misapprehend a guaranty as a pledge of collateral, and that the term collateral is understood differently by different people.[5] (Testimony of Robert Faust, Dkt. No. 108, at 216-218; Testimony of Gregory Photiadis, Dkt. No. 111, at 76; Testimony of Robert Staples, Dkt. No. 106, at 26). It is not difficult to imagine

---

[4] Thus, in responding to the request for proof of collateral, the defendant referred only to his obligations under the guaranty, and did indicate that there was some additional security agreement beyond that guaranty. If OGS representatives mistakenly understood his statements to mean that there was some additional security agreement beyond what the was stated in the guaranty, they should have insisted on seeing that document. Certainly, OGS could not have believed that the defendant would have simply handed over $1,000,000 in cash to AIG without that transaction being in writing. Moreover, the AIG letter provided with this correspondence made clear that all AIG was requiring from the Kamdars were personal guarantees, nothing else.

[5] Even the government's own witnesses could not agree on a definition of collateral. See, e.g., Testimony of Wayne Stickler, Dkt. No. 94, at 27-29 (testifying that "collateral is just the segregation of money that's set aside," that "collateral generally consists of liquid assets that are segregated into some sort of account" and that someone who pledges something as collateral would not have use of those assets because they would be "set aside"); Testimony of Robert Staples, Dkt. No. 107, at 199-200 (defining collateral from AIG's perspective as "cash or a bank letter of credit that has been taken in support of contracts"); Testimony of Robert Faust, Dkt. No. 108, at 216-17 (defining collateral from a creditor's perspective as "something that the creditor is actually taking, "either to hold" or in the form of a lien, but that contractors view a personal indemnity as collateral); Testimony of Robert Kainz, Dkt No. 107, at 86 (defining collateral as "something that someone puts up" or "puts at risk").

that a contractor who signs a full and unconditional guaranty putting all of his existing and future-acquired assets at risk would view that document as a pledge of personal collateral, legal accuracies notwithstanding.

"[A]n honest belief in the truth of the representations made by a defendant" is a complete defense to mail fraud, "however inaccurate the statement may turn out to be" and it is the government that bears the burden of disproving good faith beyond a reasonable doubt. United States v. Alkins, 925 F.2d 541, 550 (2d Cir. 1991). Even viewing all of the evidence in the light most favorable to the government, there was insufficient evidence offered to disprove the defendant's good faith defense beyond a reasonable doubt. At most, the government proved that the defendant did not understand what a "pledge of collateral" was in the legal sense.[6]

### B. Materiality of the False Statements

Even assuming the government had successfully proven that the statements concerning a pledge of collateral were false beyond a reasonable doubt, there was insufficient proof that the statement was material to the State's decision to issue the contract. Materiality of the falsehood is an element of mail fraud. Neder v. United States, 527 U.S. 1, 25 (1999); United States v. Autuori, 212 F.3d 105, 118 (2d Cir. 2000). "To be material, the information withheld either must be of some independent

---

[6] It is interesting to note that the Third Department reached the same conclusion in the civil proceeding. See State of New York v. Industrial Site Services, Inc., 52 A.D.3d 1153, 1159 (3d Dep't 2008) ("Kamdar's representations, when juxtaposed against his interpretation of the general indemnity agreement as evinced by this correspondence, suggest that he was using the word "collateral" interchangeably with the risk to his personal assets that stemmed from his personal guaranty.")

value or must bear on the ultimate value of the transaction." United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir.1994).

The Court finds that the defendant disclosed all of the facts that were material and relevant to the value of the transaction. The defendant disclosed that, before it would issue the bond, AIG required that he and his wife sign a guaranty that would put all of their personal assets at risk. He disclosed that he and his wife had decided to charge ISS a fee in exchange for their agreement to put their personal assets at risk. The defendant explained that the only other option would be for ISS to obtain a guaranty from an independent third party, which would be more expensive than the fee that he and his wife were intending to charge ISS.[7] The defendant provided OGS with the minutes of the board meeting where ISS resolved to pay the Kamdars for their agreement to put their personal assets at risk. The defendant also provided OGS with a copy of the guaranty itself with the AIG letter, both of which clearly outlined all of the Kamdars obligations to AIG. The defendant never claimed that a separate undisclosed agreement existed, nor did one. Thus, the State was aware that the cost the defendant was seeking to have reimbursed was the actual cost to ISS for the Kamdars' agreement to put their personal assets at risk. Whether those assets were put at risk through a full and unconditional guaranty (as was the case) or whether they were put at risk via a separate security agreement for the pledge of specific collateral (as OGS claims it believed to be the case) was not material to the transaction at issue. The manner in

---

[7] If this had occurred, the fee charged by that independent third party presumably would have been a reimbursable expense under the regulations, as it would have been an actual cost to ISS for issuing the bond.

which the collateral was pledged was really of no concern to OGS. That was a matter between AIG and the Kamdars because any risk of an unsecured guaranty was borne by AIG alone. What was relevant to OGS's consideration was whether the cost *to ISS* that the defendant was seeking to have paid was a legitimate, reimbursable expense.

It is simply nonsensical to suggest that OGS would <u>not</u> have approved the bond guaranty fee if they had known that the Kamdars were putting *all of their assets at risk* (as was the case under the terms of the guaranty), but they would have approved the guaranty fee if the Kamdars were putting only *some of their assets at risk* under the terms of a security agreement pledging personal collateral. The Court recognizes that some of the government witnesses testified that they viewed the absence of a pledge of personal collateral to be material to the transaction at issue. However, the fact that OGS representatives *subjectively believed* that information to be material does not make it so. Materiality is an objective matter, not necessarily limited by the purported victim's own subjective estimate of materiality. While testimony from OGS representatives as to what they considered as material is useful in assessing materiality, in the end, an objective standard governs. <u>Radiation Dynamics, Inc. v. Goldmuntz</u>, 464 F.2d 876 (2d Cir. 1972) ("The materiality of the defendants' information was not to be looked at subjectively, through the eyes of the defendants, but rather, objectively, through the eyes of the 'reasonable man.'"); <u>see also</u> <u>United States v. Phillip Morris, USA Inc</u>., 566 F.3d 1095 (D.C. Cir. 2009) (stating that in a mail or wire fraud prosecution, the materiality requirement is met if the matter at issue is "of importance to a reasonable person in making a decision about a particular matter or transaction").

Interestingly, although OGS witnesses testified that they considered the defendant's claim to have pledged personal collateral to be "very important," to their decision to pay the bond guaranty fee, they never explained why, nor were they asked to. The fact that OGS representatives believed the existence or absence of a pledge of collateral to be relevant and material goes back to their misunderstanding as to how collateral is pledged. They mistakenly believe that to pledge collateral, it must be "set aside" so that one relinquishes possession and control. However, that is simply inaccurate. See 3 Uniform Commercial Code Transaction Guide, § 27:9 (2009) (explaining that a security interest in collateral attaches if either: (1) the collateral is in possession of the secured party; or (2) there is a valid security agreement). And it is that flawed understanding of collateral that formed the basis of their decision to pay the guarantee fee. That OGS witnesses misunderstood how collateral is pledged and rested their decision to pay the guarantee fee on that mistaken premise cannot be the basis for imposing criminal liability upon the defendant. Even viewing the evidence in the light most favorable to the government, no reasonable juror who understood nature of the transaction here could find the absence of a pledge of personal collateral was material to the State's decision to pay the guarantee fee. Accordingly, judgment of acquittal as to all of the mail fraud counts is warranted.

**III. Money Laundering Charges**

Each of the 10 money laundering counts in the indictment identified one of the mail fraud counts as a predicate act. In light of this Court's determination that the government failed to prove mail fraud, all of the money laundering counts must also be dismissed.

## CONCLUSION

For the reasons stated, the Court hereby grants the defendant's Rule 29 motion and dismisses the indictment in its entirety.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: March 8, 2010